| | | |
|---|---|---|
| In re BRIDGESTONE SECURITIES LITIGATION | ) ) ) ) ) ) | MASTER FILE NO. 3:01-0017 (Consolidated Cases) <u>CLASS ACTION</u> JUDGE ECHOLS |
| CITY OF MONROE EMPLOYEES RETIREMENT SYSTEM | ) ) ) | |
| v. | ) ) | No. 3:01-0017 |
| BRIDGESTONE CORPORATION, ET AL. | ) ) ) | |
| PATRICIA ZIEMER | ) ) | |
| v. | ) ) | No. 3:01-0070 |
| BRIDGESTONE CORPORATION, ET AL. | ) ) ) | |

<u>MEMORANDUM</u>

This securities fraud class action is on remand for further proceedings after the Sixth Circuit affirmed in part and reversed in part this Court's prior ruling dismissing the case, entered on October 1, 2002 (Docket Entry Nos. 142 & 143, Memorandum and Order).  <u>City of Monroe Employees Retirement Sys. v. Bridgestone Corp.</u>, 399 F.3d 651 (6th Cir. 2005).  The Sixth Circuit affirmed the Court's prior rulings in all respects except the appeals court held that two statements made by Bridgestone Corporation ("Bridgestone") in its 1999 Annual Report issued in March 2000 and one statement made by Bridgestone Firestone North American Tire, LLC ("Firestone") on August 1, 2000, were material misrepresentations made with scienter.  Thus, the statements are actionable under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.

1

§ 78j(b), and Securities Exchange Commission Rule 10b-5, 17 C.F.R. § 240. In remanding the case, the Sixth Circuit directed this Court to determine with regard to each of the three actionable statements whether Lead Plaintiff City of Monroe Employees Retirement System ("City of Monroe") and Plaintiff Patricia Ziemer ("Ziemer") adequately pleaded in the Consolidated Complaint the remaining two elements of their securities fraud claims: justifiable reliance and proximate cause. City of Monroe, 399 F.3d at 691-692.

Lead Plaintiff City of Monroe now concedes "that its purchase of Bridgestone stock on June 15, 1998, is no longer within the class period upheld by the Sixth Circuit in finding Bridgestone's March 2000 and Firestone's August 1, 2000 statements actionable." (Docket Entry No. 201, Memorandum at 1 n.1; Docket Entry No. 194.) Thus, City of Monroe cannot satisfy the elements of a securities fraud claim, and Defendants' motions to dismiss with regard to Lead Plaintiff City of Monroe will be granted.

Remaining for the Court's consideration on the merits are (1) whether Plaintiff Ziemer sufficiently pled justifiable reliance and proximate cause to state a claim for securities fraud under section 10(b) and Rule 10b-5 and (2) whether the Iowa Public Employees' Retirement System ("IPERS"), a public pension fund, should be permitted to intervene as a plaintiff. IPERS claims that it purchased a significant number of shares of Bridgestone stock between April 5, 2000 and August 17, 2000, and, as a result of Defendants' conduct, IPERS suffered a loss of $1,630,307.

2

## I. STANDARD OF REVIEW

In support of and in opposition to the Motions to Dismiss, the parties provided documents outside of the pleadings. Normally, this would lead the Court to convert Defendants' motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) to motions for summary judgment. Weiner v. Klais & Co., Inc., 108 F.3d 86, 98 (6th Cir. 1997) (generally, "matters outside the pleadings are not to be considered by the court in ruling on a 12(b)(6) motion to dismiss"). In securities fraud cases, however, district courts may consider the full text of securities filings, the company prospectus, analysts' reports, and statements integral to a complaint, even if such documents are not attached to the complaint, without converting the motion to dismiss to one for summary judgment. In re Credit Acceptance Corp. Sec. Litig., 50 F.Supp.2d 662, 669 (E.D. Mich. 1999). Further, documents which are attached to a motion to dismiss are considered part of the pleadings if they are referred to in the complaint and are central to the plaintiff's claim. Weiner, 108 F.3d at 89. Thus, despite the parties' attachments to their pleadings, the Court will not convert Defendants' motions to dismiss to motions for summary judgment.

The Court's task in analyzing the sufficiency of the Consolidated Complaint under Rule 12(b)(6) is necessarily narrow and limited. See Miller v. Currie, 50 F.3d 373, 377 (6th Cir. 1995). The issue is not whether a claim ultimately will prevail, but whether the plaintiff is entitled to offer evidence to support the claim. Id. ("Indeed it may appear on the face of the pleadings

3

that a recovery is very remote and unlikely but that is not the test[,]" citing <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974)). Moreover, in reviewing a motion to dismiss for failure to state a claim, the Court must review the Consolidated Complaint in the light most favorable to the non-moving party, Plaintiff Ziemer, and construe all of its allegations in her favor. <u>See</u> <u>Skees v. United States</u>, 107 F.3d 421, 423 (6th Cir. 1997). The Consolidated Complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." <u>Scheuer</u>, 416 U.S. at 236 (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)).

## II. ANALYSIS

### A. Plaintiff Ziemer's securities fraud claim

In March 2000, Bridgestone issued its 1999 Annual Report. (Docket Entry No. 83, Consolidated Complaint ¶¶ 68-71.) Based on Plaintiff Ziemer's allegations in the Consolidated Complaint, the Sixth Circuit concluded that two representations in Bridgestone's 1999 Annual Report are actionable under the securities laws: "(1) that no impairment of Bridgestone's corporate assets was substantially certain to occur through problems arising from customers or regulators' actions (the 'No Impairment' representation); and (2) that there were no actual, material losses connected to the lawsuits and responses to the regulatory scrutiny of the ATX tires (the 'No Loss' representation)." <u>City of Monroe</u>, 399 F.3d at 677.

4

Concerning the "No Impairment" representation, the Sixth Circuit reasoned that the accounting policy statements in the 1999 Annual Report communicated to the investing public that if a loss or asset impairment was probable, the Annual Report would disclose that contingency in some form.  Id.  The absence of any contingency concerning Firestone tires "constituted a representation that no loss or asset impairment resulting from Firestone tire products due to the lawsuits, regulatory scrutiny, or safety-related reasons was 'probable' or 'reasonably possible.'" Id. at 678.  Because no such information was communicated in the 1999 Report, "[a] fortiori then, the Report included the representation that if there were a substantial certainty of such an impairment, that contingency or risk would be disclosed."  Id.

As to the "No Loss" representation, the Sixth Circuit reasoned that the 1999 Annual Report effectively represented there were no actual, material losses connected to lawsuits and responses to regulatory scrutiny of the Firestone ATX tires.  Id. at 680.  In actuality, however, by March 2000 Bridgestone had sustained substantial losses for thousands of warranty claims, lawsuit settlements, and reimbursements to State Farm Insurance Company for automobile accidents.  Such facts were available to Bridgestone "in an amount calculable with precision or near-precision" and, according to the Sixth Circuit, the failure to disclose such losses under the applicable accounting policies amounted to an actionable misrepresentation.  Id. at 680-681.

On August 1, 2000, after two safety groups urged Ford Motor Company to recall Explorers with Firestone ATX tires on them,

5

Firestone issued a written statement, which the Sixth Circuit found actionable: "We continually monitor the performance of all our tire lines, and the objective data clearly reinforces our belief that these are high-quality, safe tires." (Consolidated Complaint ¶ 72.) Id. at 673.

The Consolidated Complaint alleges in part:

### THE TRUTH COMES OUT

74. Unable to sustain the cover-up any longer, on August 9, 2000, Bridgestone/Firestone announced a recall of 6.5+ million ATX tires and replacement of all ATX tires on unsold Explorers in inventory. The August 9, 2000 recall and the ensuing disclosure of the true severity of problems with ATX tires over the next several weeks resulted in exactly the kind of harm to Bridgestone/Firestone that motivated defendants to scheme with each other to lie about and cover-up these problems over the past three and one-half years. . . . Bridgestone/Firestone has been plunged into a massive public relations crisis. The image of the Bridgestone/Firestone tire brand has suffered damage. . . . Bridgestone and Bridgestone/Firestone have incurred huge expenditures to fund the recall and tire replacement program and will face huge legal, public relations and advertising expenses going forward to try to recover from the consequences of this fiasco. Bridgestone/Firestone will bear huge recall costs and financial losses, which the company had not previously disclosed or properly accrued for.

(Consolidated Complaint ¶ 74.) The Complaint further alleges that the value of Bridgestone's stock and ADRs[1] "plunged during August 2000 as more evidence surfaced of defendants' complicity in the wrongdoing" and the damage to "Bridgestone/Firestone's business was increasingly quantified." (Id. ¶ 75.)

_____

[1]An American Depository Receipt or "ADR" represents ownership in a security issued by a foreign company in foreign markets. Each Bridgestone ADR represents ten shares of Bridgestone common stock.

6

The day before the tire recall, Bridgestone's ADR share price traded at approximately $205.00. (Id. ¶ 79.) Upon announcement of the recall on August 9, the share price plummeted, although it recovered somewhat before the end of the alleged class period on August 31, 2000. (Consolidated Complaint ¶¶ 1, 79.)

Plaintiff Ziemer purchased a single Bridgestone ADR, representing ten shares of stock, on August 29, 2000, just before the end of the alleged class period. She paid $144.50 per share. (Docket Entry No. 194, Ex. A.)

On August 31, 2000, *Reuters* reported that Venezuela's safety agency recommended the filing of criminal charges against Bridgestone due to tire product defects linked to at least 46 deaths in Venezuelan road accidents. (Consolidated Complaint ¶ 75.) Bridgestone's stock price took another precipitous plunge in September 2000. (Id. ¶ 79.) Bridgestone's earnings for fiscal year 2000 were its lowest in a decade.

Plaintiff alleges: "Class members were damaged. In reliance on the integrity of the market, they paid artificially inflated prices for Bridgestone's stock and ADRs." (Id. ¶ 101.)

### *1. Justifiable Reliance*

Defendants first contend that Plaintiff Ziemer cannot plead justifiable reliance on the March and August 2000 statements because she purchased a Bridgestone ADR on August 29, 2000, nearly three weeks after the announced recall on August 9, 2000 of more than 6.5 million ATX tires. Defendants assert the tire recall cured their prior alleged misrepresentations.

7

"An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price." Basic Inc. v. Levinson, 485 U.S. 224, 247 (1988). Because market prices reflect most of the publicly-available information, an investor's reliance on any public material misrepresentations may be presumed for purposes of a securities fraud action. Id.; Marsh v. Armada Corp., 533 F.2d 978, 981-982 (6th Cir. 1976) (observing plaintiff has standing to bring securities fraud claim where she purchased stock within reasonable time after allegedly fraudulent conduct occurred as such purchase supports inference of reliance on alleged misrepresentations, citing Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975)). In Freeman v. Laventhol & Horwath, 915 F.2d 193, 197 (6th Cir. 1990), the Sixth Circuit wrote:

> The fraud on the market theory rests on the assumption that the price of an actively traded security in an open, well-developed, and efficient market reflects all the available information about the value of a company. Peil v. Speiser, 806 F.2d 1154, 1160 (3d Cir. 1986). Misrepresentations, therefore, affect the price of the security. Investors rely on the price of the security as an accurate reflection of its worth. They, therefore, rely indirectly on such misrepresentations, even if they do not rely on them directly. Id. at 1161; Levinson, supra, 786 F.2d at 750; Blackie v. Barrack, 524 F.2d 891, 907 (9th Cir. 1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).

It logically follows that material misrepresentations induce investors to purchase stock when otherwise they might not do so if all truthful facts were disclosed. See Levin v. Arneault, No. G88-237 CA, 1989 U.S. Dist. LEXIS 17056 at *20 (W.D. Mich. Dec. 22, 1989) (citing Platsis v. E.F. Hutton & Co., 642 F. Supp. 1277, 1298-1299 (W.D. Mich. 1986), aff'd, 829 F.2d 13 (6th Cir. 1987)).

8

Because Plaintiff seeks redress through a fraud-on-the-market theory, however, "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or [her] decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." Basic Inc., 485 U.S. at 248. Moreover, when corrective information is disseminated to the market, those who trade on the "shares after the corrective statements would have no direct or indirect connection with the [alleged] fraud." Id.; Marsh, 533 F.2d at 982 n.3 ("Although the presence of reliance goes to the sufficiency of the complaint, standing is not accorded to a plaintiff if [her] purchase . . . occurs . . . after the alleged fraudulent conduct was exposed . . . because in such situations reliance clearly could not exist."). Plaintiff's claim must fail if the "truth" was revealed to the market before she purchased her ADR. Greenberg v. Copmuware Corp., 889 F. Supp. 1012, 1015 (E.D. Mich. 1995).

Taking the allegations of the Consolidated Complaint as true, a reasonable jury could find that Plaintiff reasonably relied on the integrity of the market, informed in part by Defendants' March and August 2000 statements, when she purchased an ADR on August 29, 2000. The Consolidated Complaint alleges that the truth began to come out on August 9, 2000, when Bridgestone and Firestone were "[u]nable to sustain the cover-up any longer[.]" (Consolidated Complaint ¶ 74.) Although Bridgestone characterizes the tire recall as the "seminal and 'inevitable' event that plaintiff claims defendants concealed from investors by making the alleged misrepresentations and omissions[,]" (Docket Entry No. 194,

9

Supplemental Memorandum at 4), and Firestone contends the "recall itself is . . . effectively a corrective disclosure that eliminates any argument that the August 1, 2000 statement caused" Plaintiff's loss (Docket Entry No. 197, Supplemental Memorandum at 5), the Consolidated Complaint makes no claim that the tire recall immediately cured all allegedly false information provided by Defendants that artificially inflated Bridgestone's stock price. To the contrary, the Complaint alleges that "[t]he August 9, 2000 recall and the ensuing disclosure of the true severity of problems with ATX tires over the next several weeks" caused harm to investors like Plaintiff. (Consolidated Complaint ¶ 74.) *See Freeman*, 915 F.2d at 197-198 (noting plaintiff must allege and prove trade in stock between time misrepresentations were made and time truth was revealed to invoke fraud on market presumption of reliance).

Shortly after the tire recall was announced, the value of Bridgestone's share price plummeted, but then rebounded to higher levels by late August 2000, when Plaintiff purchased an ADR. She alleges she relied on the integrity of the market on August 29, 2000, the day she purchased an ADR; yet, at that time the market still had not been fully informed of the extent of Defendants' knowledge, actions, and inactions with regard to the ATX tires.

Plaintiff alleges that, after August 29, "more evidence surfaced of defendants' complicity in the wrongdoing." (Consolidated Complaint ¶ 75.) Additional information was revealed through congressional investigations, a ban on the importation of ATX tires in Saudi Arabia, and a referral for criminal prosecution

10

of Bridgestone in Venezuela, announced the day after Plaintiff purchased her Bridgestone ADR. (Consolidated Complaint ¶¶ 74-76.) Investors learned that Bridgestone and Firestone had known about the tire defects for years, had colluded to keep consumers and investors unaware of the tire flaws, had covered up the fatalities and injuries caused by the tires, had hidden thousands of lawsuits arising from the defective tires, had failed to reveal settlements with injured victims, had not disclosed reimbursements to State Farm, and had not described the massive impact of the problem on Defendants' business. The previously undisclosed information directly contradicted the purported truth of Bridgestone's March 2000 statements in its 1999 Annual Report and Firestone's August 1, 2000 statement to the media.

These revelations prompted renewed depreciation in the value of Bridgestone stock. (Id. at ¶ 79.) See Dura Pharmaceuticals, 125 S.Ct. at 1633 (noting one who misrepresents financial condition of corporation to sell its stock becomes liable to relying purchaser for loss sustained when facts become generally known and share price depreciates). Bridgestone and Firestone continued to lose business in the fall of 2000, with profits plunging eighty percent (80%) for 2000, while the Bridgestone stock and ADR price plummeted fifty percent (50%). (Consolidated Complaint ¶¶ 79-80.)

According to Plaintiff, the "whole truth" finally came out by December 2000 and the months thereafter. In December Firestone released its own investigative report admitting the ATX tires were defective in design and manufacture. (Consolidated Complaint ¶ 78.) In February 2001, Bridgestone reported the tire recall had cost

11

$754 million, and Firestone had suffered a loss of $510 million for fiscal year 2000. (<u>Id.</u> ¶ 80.)

Defendants' financial losses directly impacted investors like Plaintiff. The allegations of the Consolidated Complaint distinguish Plaintiff's pleading from the one reviewed in <u>D.E. & J. Limited Partnership v. Conaway</u>, 133 Fed. Appx. 994, 1000 (6th Cir. 2005). There the plaintiff did nothing more than allege the stock price dropped after a bankruptcy announcement and did not allege the market's acknowledgment that prior misrepresentations caused the price drop. Here, Plaintiff has alleged the share price drop and tied it directly to the market's acknowledgment of Bridgestone's and Firestone's prior alleged misrepresentations.

Plaintiff's case is also distinguishable from <u>Zucker v. Sasaki</u>, 963 F. Supp. 301, 307 (S.D.N.Y. 1997), where the plaintiff failed to plead justifiable reliance because she did not purchase her shares between the time the alleged misrepresentations were made and the time the truth was revealed. Plaintiff adequately alleges her justifiable reliance on the integrity of the market as it existed on August 29, 2000, when she purchased a Bridgestone ADR.

### *2. Loss Causation and Economic Loss*

Plaintiff has the burden to prove that the acts or omissions of the Defendants alleged to violate the securities laws caused the loss for which the Plaintiff seeks to recover damages. 15 U.S.C. § 78u-4(b)(4). The loss causation requirement forces a plaintiff to tie particular losses directly to specific alleged misconduct and thus, the concept is akin to proximate cause in tort law to

12

protect securities fraud defendants from assuming the role of insurer for all investment losses. <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 125 S.Ct. 1627, 1633 (2005).

Defendants contend that Plaintiff fails to plead loss causation, particularly because the Consolidated Complaint utilizes language identical to that rejected by the Supreme Court in <u>Dura Pharmaceuticals</u>, 125 S.Ct. at 1634. In that case, the plaintiffs pled that they "'paid artificially inflated prices for Dura's securities' and suffered 'damages.'" <u>Id.</u> The Supreme Court held the complaint was legally insufficient because it "(1) failed 'to claim that Dura's share price fell significantly after the truth became known,' (2) failed to specify 'the relevant economic loss,' and (3) failed to describe 'the causal connection . . . between [the] loss and the misrepresentation.'" <u>D.E. & J. Limited Partnership</u>, 133 Fed. Appx. at 999. Unless a securities-fraud plaintiff provides the defendant with "some indication of the loss and the causal connection that the plaintiff has in mind," the securities laws become nothing more than "a partial downside insurance policy." <u>Dura Pharmaceuticals</u>, 125 S.Ct. at 1634.

Here, Plaintiff alleges similarly to <u>Dura</u>: "Class members were damaged. In reliance on the integrity of the market, they paid artificially inflated prices for Bridgestone's stock and ADRs." (Consolidated Complaint ¶ 101.) The Consolidated Complaint was drafted before the Supreme Court issued the <u>Dura Pharmaceuticals</u> opinion. But even so, Plaintiff alleges elsewhere in the Consolidated Complaint that the value of Bridgestone shares dropped significantly in September 2000, shortly after she bought one ADR,

13

as a direct result of additional negative information about Bridgestone and Firestone that made its way into the marketplace. (Id. ¶¶ 75-79.) This distinguishes Plaintiff's case from Dura Pharmaceuticals and D.E. & J. Limited Partnership because Plaintiff does allege that Bridgestone's share price fell in September 2000 as the true severity of problems with ATX tires surfaced and Plaintiff does connect the alleged fraud with the ultimate disclosure and loss.

Finally, Defendants contend that the Consolidated Complaint fails to allege Plaintiff sold her Bridgestone ADR at a loss and thereby suffered damages, relying on In re Royal Dutch/Shell Transp. Sec. Litig., 380 F. Supp.2d 509, 557 (D. N.J. 2005) (holding those who purchased stock during class period but have yet to sell the securities have not alleged proximate causation and economic loss). The holding on which Defendants rely is no longer good law. A different district judge reconsidered the issue inIn re Royal Dutch/Shell Transp. Sec. Litig., 404 F. Supp.2d 605, 611 (D. N.J. 2005), and held that a plaintiff need not sell securities in order to plead and prove loss causation and economic loss. The court reasoned that the statutory scheme does not mandate the sale of securities, 15 U.S.C. § 78u-4(e)(1), (2),[2] and the statute is consistent with prior case law which did not mandate a sale of securities before a plaintiff could proceed with a securities fraud

---

[2]This statute specifically recognizes that a plaintiff can either hold stock for a 90-day period and recover the difference between purchase price and mean price over the 90 days, or the plaintiff may sell stock in less than 90 days and recover the difference between purchase price and the mean price for the shorter period.

14

action.  <u>Id.</u> at 608-609.  The out-of-pocket rule permits a stock "purchaser to recover the difference between the purchase price and the true value of the securities absent the alleged fraud as measured by the correction in the market price following curative disclosure[,]" or in other words, "'the price paid minus the inflation attributable to the defendants' alleged wrongful acts.'" <u>Id.</u> at 610 (quoted case omitted).  For many years, courts have allowed "holding plaintiffs" to maintain securities fraud actions. <u>Id.</u> (and cases cited therein).

Plaintiff does not allege that she sold her Bridgestone ADR at a loss.  It is implied within the Consolidated Complaint that she is a "holding plaintiff."  Although Plaintiff does not allege the amount of her economic loss with any specificity, the formula for calculating such damages is well-settled in the law, Plaintiff's economic loss can be quantified during discovery, and the damages are not theoretical or speculative.  Consequently, the Court concludes that the Consolidated Complaint adequately alleges proximate causation and economic loss.

Because Plaintiff Ziemer purchased Bridgestone securities during the class period identified by the Sixth Circuit and because she suffered injury as a result of her purchase, she has standing to sue for her own injury.  Whether Plaintiff "will be able to represent the putative class, including absent class members, depends solely on whether [she] is able to meet the additional criteria encompassed in Rule 23 of the Federal Rules of Civil Procedure." <u>Fallick v. Nationwide Mut. Ins. Co.</u>, 162 F.3d 410, 423

15

(6th Cir. 1998). This question is left for another day when the matter of class certification is presented to the Court for ruling.

Although City of Monroe will no longer serve as Lead Plaintiff, it does not follow that the entire case must be dismissed, as Defendants contend. Relying on <u>In re Guidant Corp. Sec. Litig.</u>, 2004 U.S. Dist. LEXIS 22809 at *76-78 (S.D. Ind. Nov. 8, 2004), Defendants contend dismissal is required where the lead plaintiff lacks standing. The case does not stand for the proposition asserted. The district court in that case wrote: "If the Gaynors seek to continue as lead plaintiffs in this action, they bear the burden of mustering the necessary competent proof to establish their standing to bring this litigation." <u>Id.</u> at *77. The court dismissed the action without prejudice and permitted the filing of an amended complaint within forty-five (45) days. <u>Id.</u> at *78. Here, Plaintiff Ziemer remains in the suit, and IPERS seeks intervention as a party plaintiff, as discussed more fully below.

**B. IPERS' Motion to Intervene**

IPERS requests leave to intervene as of right as a named plaintiff in this action pursuant to Federal Rule of Civil Procedure 24(a)(2), or in the alternative, IPERS seeks permissive intervention under Rule 24(b)(2). IPERS proposes to replace City of Monroe as an institutional investor and plans to seek class representative status under Federal Rule of Civil Procedure 23 if permitted to intervene.

Established in 1953, IPERS is a public retirement plan based in Des Moines, Iowa, which serves the interests of current and retired Iowa state employees and their families. IPERS currently

16

has about 350,000 members and maintains over \$19 billion in fund assets. From April 5, 2000 to August 17, 2000, during the abbreviated class period identified by the Sixth Circuit, IPERS purchased 181,000 shares of Bridgestone stock.[3] (Docket Entry No. 209-2, Schochenmaier Decl., Attachment.) IPERS claims that it seeks damages for a loss of \$1,630,307, (Docket Entry No. 209-1, Memorandum at 1 n.1), but that figure is not set forth in Gregg Schochenmaier's supporting Declaration. IPERS adopts the allegations of the Consolidated Complaint, subject only to the adjustments necessary to establish its purchases during the modified class period established by the Sixth Circuit.

Rule 24(a)(2) allows intervention as of right when:

> the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

See <u>Michigan State AFL-CIO v. Miller</u>, 103 F.3d 1240, 1245 (6th Cir. 1997). Rule 24 is broadly construed in favor of the intervenor. <u>Purnell v. City of Akron</u>, 925 F.2d 941, 950 (6th Cir. 1991).

A party moving to intervene under Rule 24(a)(2) must satisfy four requirements before intervention as of right will be granted: (1) a timely application to intervene; (2) a substantial legal interest in the case; (3) impairment of the ability to protect that

---

[3]This figure is reached by adding the number of shares purchased on five occasions listed on the attachment to the Gregg Schochenmaier Declaration. (Docket Entry No. 209-2.) IPERS states in its Memorandum that it purchased 593,0900 shares, but the Schochenmaier Declaration does not support that figure.

17

interest in the absence of intervention; and (4) inadequate representation of that interest by parties already before the court. <u>Jordan v. Michigan Conference of Teamsters Welfare Fund</u>, 207 F.3d 854, 862 (6th Cir. 2000).

In assessing the timeliness of the intervention request, the Court must consider five factors in the context of all relevant circumstances:

> (1) the point to which the suit has progressed; (2) the purpose for which the intervention is sought; (3) the length of time preceding the application during which the proposed intervenor knew or reasonably should have known of his interest in the case; (4) prejudice to original parties due to the proposed intervenor's failure, after he or she knew or reasonably should have known of his interest in the case, to apply promptly for intervention; and (5) existence of unusual circumstances militating against or in favor of intervention.

<u>Id.</u>

Having considered each of these factors, the Court finds that IPERS' Motion to Intervene is timely brought. <u>See</u> <u>id.</u> The case is on remand following an appeal to the Sixth Circuit on Defendants' Motions to Dismiss. As stated above, Defendants' Motions to Dismiss will be granted in part and denied in part. As a result of the Sixth Circuit's opinion and this Court's ruling, Lead Plaintiff City of Monroe may no longer participate in this case. Although IPERS undoubtedly knew about the pendency of this action from its inception, the necessity of IPERS' requested intervention as a party plaintiff did not arise until after the Sixth Circuit issued its opinion. At that point, IPERS realized the only other institutional investor in the case, City of Monroe, could no longer represent the interests of IPERS and other institutional investors.

18

After the Sixth Circuit's mandate issued, this Court held a status conference on October 24, 2005. The parties filed supplemental memoranda on the pending Motions to Dismiss, and on December 14, 2005, IPERS filed its Motion to Intervene. Defendants are not prejudiced by the timing of the intervention motion because the Court is now ruling on the Motions to Dismiss and discovery has been stayed. The Court has not yet had an opportunity to consider class certification. Therefore, having considered all of the relevant circumstances, the Court finds that IPERS' Motion to Intervene is timely brought.

IPERS has a direct and substantial interest in the case, and without intervention, it is possible that IPERS' substantial interest would be impaired. See Michigan State AFL-CIO, 103 F.3d at 1247. The Sixth Circuit has specifically ruled that claims like those raised by IPERS in the period March to August 2000 are actionable. City of Monroe, 399 F.3d at 690-691. As the case presently stands, City of Monroe cannot serve as Lead Plaintiff because its stock purchases occurred in 1998, before the class period. No other institutional investor is currently a plaintiff party. While Plaintiff Ziemer remains in the suit, her purchase of one Bridgestone ADR representing ten shares of stock occurred on August 29, 2000, shortly before the close of the class period. She did not purchase any shares between March and August 2000, as IPERS did. Thus, Plaintiff Ziemer does not adequately protect the interests of IPERS and IPERS' interests may be impaired or impeded if it is not permitted to intervene in this action. See id. Although Defendants contend that IPERS may protect its interests by

19

filing its own individual action, the Court concludes that requiring individual parties to file separate lawsuits while a potential class action is pending would unnecessarily multiply litigation, lead to potentially different results and defeat the purpose of class action lawsuits.

Accordingly, the Court will grant IPERS' Motion to Intervene as of right under Rule 24(a)(2). The Court need not consider the request for permissive intervention under Rule 24(b)(2).

IPERS' Motion to Intervene does not appear to run afoul of the Private Securities Litigation Reform Act's requirement for appointment of a lead plaintiff in securities fraud cases. 15 U.S.C. §§ 77z-1(a)(3)(A)(i) & 78u-4(a)(3)(A)(i); In re Initial Public Offering Sec. Litig., 214 F.R.D. 117 (S.D.N.Y. 2002). The Sixth Circuit opinion makes clear that this case is not abusive and manipulative securities litigation, as Defendants contend. The procedures for notice and determination of a lead plaintiff were followed at the commencement of suit, and City of Monroe was designated Lead Plaintiff. The Sixth Circuit's opinion eviscerates City of Monroe's ability to continue as Lead Plaintiff. At the present time, IPERS seeks only to intervene in the lawsuit; it does not move for designation as Lead Plaintiff. Thus, the Court need not venture further into this area to rule on the pending Motion to Intervene.

## C. Motion to Continue the Stay of Discovery

Defendant Bridgestone moved to continue the Reform Act's automatic stay of discovery until final resolution of Defendants' Motions to Dismiss. (Docket Entry No. 195). Defendant Firestone

20

essentially joined in the Motion by filing a "Brief in Support of the Applicability of Statutory Discovery Stay." (Docket Entry No. 198).

Because the automatic stay of discovery remained in place pending the Court's instant ruling on the Motions to Dismiss, Defendants' motion to continue the stay of discovery will be denied as moot.

### III.  CONCLUSION

Lead Plaintiff City of Monroe concedes that its securities fraud claims no longer remain viable after the Sixth Circuit's opinion.  Thus, Defendants' Motions to Dismiss City of Monroe's claims will be granted.  Plaintiff Patricia Ziemer adequately alleges justifiable reliance, proximate cause and economic loss to continue with her securities fraud claims. Accordingly, Defendants' Motions to Dismiss her claims will be denied.

IPERS' Motion to Intervene as a plaintiff will be granted. Defendant Bridgestone's Motion to Continue The Reform Act's Automatic Stay of Discovery will be denied as moot.

An appropriate Order shall be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE